FILED
2020 DEC 8
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KAITLYN CUDNEY, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED STATES of AMERICA,<br><br>      Defendant. | FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING DAMAGES<br><br>Case No. 1:17-cv-190 DBP<br><br>Magistrate Judge Dustin B. Pead |

The court conducted a bench trial in this matter February 3-5, 2020 and heard final arguments March 11, 2020.[1] Plaintiffs were represented by Zev T. Gershon and Randal D. Getz of Gershon Willoughby & Getz, and the United States was represented by Assistant United States Attorneys Jeffrey E. Nelson and Melina Shiraldi. The court heard the testimony of witnesses, received into evidence Exhibits 1-41,[2] and considered the parties' arguments.

The court entered its Findings of Fact and Conclusions of Law and concluded, "by the narrowest of margins, that the standard of care was not fully met." (ECF No. 54 p. 1.) Thus, Plaintiff W.A.N. is entitled to damages. The court received proposed damage findings from both parties. Having fully considered those proposed findings, the court has determined that the preponderance of evidence supports damages in an amount less than that sought by Plaintiffs, but more than that proposed by Defendant. The court declines Plaintiffs' invitation for further responses on the issues of damages, finding it unnecessary based upon the record in this case.

---

[1] This matter is before the undersigned pursuant to the consent of the parties based upon 28 U.S.C. 636(c). (ECF No. 22.) An appeal from a judgment entered by a United States Magistrate Judge will be made directly to the United States Court of Appeals for the Tenth Circuit in the same manner as an appeal from any other judgment of this district. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

[2] Exhibits 29-35 were received as learned treatises or periodicals pursuant to FED. R. EVID. 803(18).

In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial. In short, the injuries sustained by W.A.N. during childbirth will have an impact on his quality of life, however, there is hope through vocational training that W.A.N will have a meaningful productive life.

## OVERVIEW

Plaintiffs Kaitlin Cudney and William Neria sued the United States under the Federal Tort Claims Act (FTCA) 28 U.S.C. § 2671 *et seq.* Plaintiffs' son, W.A.N., was injured during his birth on April 7, 2016. Ms. Cudney received prenatal care from physicians employed by Midtown Community Health Center ("Midtown") in Ogden, Utah, and W.A.N. was delivered by a physician employed by Midtown. The court concluded that Plaintiffs proved by a preponderance of evidence that Midtown physicians failed to meet the applicable standard of care in rendering care on behalf of Ms. Cudney, which proximately caused W.A.N.'s injury and damages. (ECF 54 at 22.) Not to be unexpected, there is a large difference between the parties' alleged damages for W.A.N.'s injuries. The court turns to each category of damages.

## PAST MEDICAL BILLS

The court begins at past medical bills of $191,318.50. There is agreement between the parties as to this amount, and the record supports this sum. The court finds that $191,318.50 is properly awarded to Plaintiffs.

## NON-ECONOMIC DAMAGES

Plaintiffs seek the maximum cap for non-economic damages of $450,000. In contrast Defendant alleges $150,000 is proper. The evidence indicates as follows:

1.      During W.A.N.'s birth on April 7, 2016, he suffered damage to the brachial plexus nerves leading from his spinal cord to his right shoulder and arm. Ex. 10.0014-20. W.A.N. was admitted to the Newborn Intensive Care Unit (NICU), where he stayed for 12 days. *Id*. W.A.N. had no movement of his right arm, and he was diagnosed with a brachial-plexus palsy. Ex. 10.0018-19.

2.      In October and December 2016, W.A.N. underwent nerve transfer and graft surgeries in an effort to improve the function of his right arm. Tr. at 172:14-23; Ex. 11.0528-31, 11.0687-88. These procedures produced some improvement, yet W.A.N. continues to have weakness and difficulty in using his right arm. Tr. at 270:18-271:7.[3]

3.      W.A.N. was seen by Dr. Steven Janselewitz, a pediatric rehabilitation specialist at Randall Children's Hospital in Portland, Oregon. Tr. at 263:12-23; 266:10-19. Dr. Janselewitz has seen W.A.N. several times. Tr. at 266:10-24; 271:15-25.

4.      Dr. Janselewitz prescribed occupational therapy for W.A.N. with the goal of improving his ability to use his right arm, which will assist him to qualify for employment. Tr. at 271:15-25, 288:8-289:9. Dr. Janselewitz believes that W.A.N. will likely benefit from regular occupational therapy through age five or six, with intermittent therapy thereafter. Tr. at 272:1-8.

5.      Dr. Janselewitz testified that he has seen some improvement in W.A.N.'s right arm function. Tr. at 272:9-13. W.A.N. can lift his right arm about 30 degrees at the shoulder; he

---

[3] Tr. refers to the transcript of the trial held before the undersigned.

3

has difficulty with elbow flexion, but has better movement with elbow extension; he has slight weakness with wrist extension; and he has good finger movement. Tr. at 272:14-22.

6.      Dr. Janselewitz anticipates injecting Botox in W.A.N.'s right arm to improve his elbow flexion, although he believes it will remain weak. Tr. at 281:13-282:6.

7.      Dr. Janselewitz opined that the limitations in the movement and strength of W.A.N.'s right arm are permanent. Tr. at 273:12-14.

8.      W.A.N. gave no indication that he was experiencing pain in his right arm when Dr. Janselewitz examined him in January 2020, and W.A.N.'s physical therapist has also reported that W.A.N. has not experienced pain during her sessions with him. Tr. at 280:22-281:12.

9.      Dr. Janselewitz opined that W.A.N. will be limited to lifting no more than five pounds with his right arm. Tr. at 274:22-25.

10.      W.A.N.'s left arm is his dominant arm, and he is not limited in the use or strength of his left arm. Tr. at 277:16-278:9. He will be able to use his right arm to hold and stabilize items with both hands. Tr. at 284:20-285:8.

11.      Dr. Janselewitz testified that W.A.N. will be at risk for an overuse injury of his arms if he uses either of them repeatedly for repetitive movements or tasks. Tr. at 274:4-18, 282:22- 283:9. Less frequent use of either arm would not cause an overuse injury. Tr. at 283:16-284:19.

12.      Dr. Janselewitz testified that W.A.N. will be able to use a keyboard, so long as his right hand is positioned where he can reach the keys. Tr. at 282:7-283:21. Dr. Janselewitz stated that a wrist splint will help to maintain the position of W.A.N.'s right wrist and hand. Tr. at 287:13-23.

4

13.    W.A.N.'s birth injury has no affect his ability to walk or run. Tr. at 285:9-12.

14.    Dr. Janselewitz opined that W.A.N. will be able to engage in activities that will not require the full strength and range of motion of his right arm, such as playing soccer or riding a bicycle. Tr. at 285:13-287:10.

15.    W.A.N.'s birth injury has not impaired his speech, hearing, or cognitive abilities, and Dr. Janselewitz testified there are jobs that W.A.N. will be able to perform despite the limitations of his right arm function. Tr. at 290:7-291:6.

16.    Based upon the evidence and testimony offered before the court, the court finds that W.A.N.'s plexus palsy injury is severe enough that $350,000.00 is a fair award of non-economic damages to compensate W.A.N for his pain, suffering, and disability. The court acknowledges that it can be difficult to quantify an injury such as W.A.N.'s. Yet, the evidence indicates that although his injury is severe, through training and rehabilitation, W.A.N. will have some use of his right arm and possibly his right hand in a minimal manner.

## ECONOMIC DAMAGES

As presented at trial, economic damages in this case consist of the reduction in W.A.N.'s future earning capacity; the cost of replacing household services that W.A.N. will be unable to perform; and the medical expenses incurred for W.A.N.'s care through the time of trial. As set forth above, the amount of medical expenses is agreed upon by the parties. Each of the parties presented the testimony of a vocational-rehabilitation expert and an economics expert in support of their evaluations of the lost-income and household-services damages. The parties' experts agree on the following factual assumptions relevant to these issues:

(i).    W.A.N.'s life expectancy is 77.4 years. Tr. at 317:19-22.

(ii).     W.A.N.'s work-life expectancy, beginning at the age of 18, is 38.72 years. Tr. at 639:16-640:1.

(iii).    The standard methodology used to determine a child's future income-earning capacity, known as the PEEDS-RAPEL method, is to base the child's likely educational and occupational achievement on that of the child's parents and other members of the child's extended family. Tr. at 300:12-301:25; 520:18-521:19, Ex. 22.0008.

(iv).     W.A.N.'s mother, Kaitlin Cudney, is a 32-year-old high school graduate who is currently employed building winches. Tr. at 159:2; 160:3-8.

(v).      W.A.N.'s father, William Neria, is a 32-year-old high school graduate who is currently employed as a pipelayer. Tr. at 415:13-16; 416:7-9.

(vi).     W.A.N. will likely graduate from high school in 2034, at the age of 18, and then enter the workforce. Tr. at 304:2-14; 522:16-23.

(vii).    The average value of fringe benefits provided to employees in the United States is 26% of the employee's income. Tr. at 431:17-23; 640:4-6.

(viii).   Household services are the activities that an individual performs at home, such as cooking, cleaning, yard work, home repairs, and other similar activties. Tr. at 315:22-316:6, Ex. 29.0002.

(ix).     Adult men in the United States spend an average of 2.37 hours per day—865 hours per year—rendering household services. Tr. at 316:7-20, 652:20-24.

(x).      The "present value" of losses that will be incurred in the future is the amount of money invested today that will provide enough money, with no shortage or leftover funds, to compensate for the future losses. Tr. at 426:7-12, 638:25-639:6.

6

I.    **Reduction of Income-Earning Capacity**

A.    **Plaintiff's Position Regarding Reduction in Income-Earning Capacity**

Plaintiffs presented the testimony of Scott Stipe, MA, a certified rehabilitation counselor, in support of their position regarding W.A.N.'s loss of income-earning capacity. Tr. at 293:1-4. Mr. Stipe established three models to evaluate the employment career W.A.N. would have had if he had not suffered the brachial plexus injury. Tr. at 304:20-21. In each model, Mr. Stipe assumed that W.A.N. would have begun working at a wage equal to the 10th percentile of the average wage in that model, would have progressed to the 50th percentile wage after five years of employment, and after five more years he would have progressed to the 90th percentile wage. Tr. at 308:11-22, Ex. 220010-11.

a.   Pre-Injury Model A assumes that W.A.N. would have worked in unskilled or semiskilled occupations such as construction, carpenter helper, plumbing helper, and pipelayer. Tr. at 304:20-305:1, Ex. 22.0010. The 10th percentile wage under Pre-Injury Model A is $27,643, the 50th percentile is $36,587, and the 90th percentile is $53,352. Ex. 22.0010.

b.   Pre-Injury Model B presumes that W.A.N. would have obtained additional training by way of technical coursework or an apprenticeship, qualifying him to work in higher skilled jobs such as an auto mechanic, plumber, and carpenter. Tr. at 305:4-18, Ex. 22.0012. The 10th percentile wage under Pre-Injury Model B is $37,482, the 50th percentile is $59,675, and the 90th percentile is $85,010. Ex. 22.0012.

c.   Pre-Injury Model C presumes that W.A.N. would have worked in the skilled jobs described in Pre-Injury Model B and then would have transitioned to a foreman or a supervisory position over the following five to seven years reaching a top wage of

$126,131 per year. Tr. at 305:19-306:7, Ex. 22.0012.

Mr. Stipe opined that W.A.N. was not likely to be employed in the occupations described in Pre-Injury Model A. Tr. at 306:14-23. Rather, Mr. Stipe averred that W.A.N. likely would have been employed in the occupations described in Pre-Injury Model B or Pre-Injury Model C, with those two models being equally likely. Tr. at 306:8-13, Ex. 22.0014. Mr. Stipe also prepared two models for W.A.N.'s employment prospects with his right arm disability. Tr. at 312:12-17.

  a. Post-Injury Model A assumes that W.A.N. will not be able to maintain consistent employment and will have only marginal earnings. Tr. at 312:12-313:11, Ex. 22.0013.

  b. Post-Injury Model B presumes that W.A.N. will be able to work in sedentary or light occupations, but he will require one year of specialized training before beginning employment. Tr. at 314:21-315:16, Ex. 22.0013-14. W.A.N. would begin at the 10th percentile of the average wages in those occupations, would progress to the 50th percentile wage after 10 years, and would see no further increase in his wage. Id.

Mr. Stipe opined that W.A.N. is more likely to fit his Post-Injury Model A, and thus will have essentially no income during his life. Tr. at 314:7-20.

**B.    Defendant's Position Regarding Reduction in Income-Earning Capacity**

The United States presented the testimony of Mark Hedrick, MS, a vocational rehabilitation counselor, in support of its position regarding W.A.N.'s loss of income-earning capacity. Tr. at 512:10-513:9. Mr. Hedrick evaluated three models for the types of occupations W.A.N. would have had if he had not suffered his birth injury. In each model, Mr. Hedrick assumes that W.A.N. would have begun working at a wage equal to the 10th percentile of average wage in that model; would have moved to the 25th percentile wage in year two to four of

8

his employment; would have moved to the median-to-mean wage in year five to seven of employment; would have reached the 75th percentile wage in year 10 to 14 of employment; and would achieved the 90th percentile wage in approximately year 18 to 20 of employment. Tr. at 526:3-23, Ex. 24.0009.

    a.   No-Injury Model A assumes that W.A.N. would have entered the workforce in an unskilled or semiskilled job such as a pipelayer, flagger, light truck driver, carpenter helper, bank teller, or forklift operator. Tr. at 524:11-525:16, Ex. 24.0009. The 10th percentile wage in this model is $27,248, the 25th percentile is $29,619, the median-to-mean wage is $34,341-37,190, the 75th percentile is $42,869, and the 90th percentile is $52,312. *Id*.

    b.   No-Injury Model B presumes that W.A.N. would have progressed to a supervisory position, such as a saw mill supervisor, truck driver supervisor, construction supervisor, or auto mechanic supervisor. Tr. at 545:4-15, Ex. 24.0010. The 10th percentile wage in this model is $40,726, the 25th percentile is $48,714, the median-to-mean wage is $60,882- 63,232, the 75th percentile is $75,712, and the 90th percentile is $89,211. Ex. 24.0010-11.

    c.   No-Injury Model C assumes that W.A.N. would have completed post-secondary or apprenticeship training for occupations such as carpenter, electrician, automobile mechanic, heavy truck driver, or plumber. Ex. 24.0011. The 10th percentile wage in this model is $38,147, the 25th percentile is $46,675, the median-to-mean wage is $57,200-58,261, the 75th percentile is $68,890, and the 90th percentile is $81,744. Id.

Mr. Hedrick opined that W.A.N. would more likely than not, have been employed in the occupations described in No-Injury Model A, and would not have obtained employment in the

occupations described in No-Injury Model B or No-Injury Model C. Tr. at 524:16-25, 530:17-532:16. Mr. Hedrick also prepared models for the occupations he believes W.A.N. will be qualified for with his right arm that now has limited functionality.

    a.  Injury Model D presumes that W.A.N. will obtain employment in semiskilled sedentary jobs such as order clerk, customer service representative, or receptionist. Ex. 24.0012-13. The 10th percentile wage in this model is $26,374, the 25th percentile is $29,182, the median-to-mean wage is $35,630-37,419, the 75th percentile is $43,784, and the 90th percentile is $52,936. *Id.*

    b.  Injury Model E assumes that W.A.N. will obtain employment in unskilled or semiskilled occupations in a light-work category such as retail sales clerk, bank teller, mail clerk, flagger, or courier. Ex. 24.0013-14. The 10th percentile wage in this model is $26,021, the 25th percentile is $27,810, the median-to-mean wage is $31,970-33,571, the 75th percentile is $37,606, and the 90th percentile is $44,554. *Id.*

Mr. Hedrick opined that W.A.N. will be more likely to obtain employment in the sedentary jobs described in Injury Model D than in the light-duty jobs described in Injury Model E. Tr. at 542:3-7, 544:1-23.

**C.    The court finds the testimony of Mr. Hendrik more reliable and credible than the testimony of Mr. Stipe**

The court is not persuaded that W.A.N. will have no earning capacity as opined by Plaintiffs' expert Mr. Stipe. The court is empathetic to W.A.N.'s injuries, however, with appropriate vocational training, the court finds the evidence supports the theory that W.A.N. will find gainful employment and meaningfully contribute to society. His prognoses is not as grim as Mr. Stripe allgeges.

The court is persuaded that Mr. Hedrick's conclusion that W.A.N. would likely have been employed in an unskilled or semiskilled occupation in the absence of his injury is more consistent with the PEEDS-RAPEL method that both he and Mr. Stipe rely upon. Mr. Hedrick testified that of the 14 family members whose employment history is available, only one, W.A.N.'s paternal grandmother, had post-secondary employment training. Tr. at 531:4-7. And of the 20 occupations of family members identified in the PEEDS-RAPEL method, only three involved supervisory responsibilities. Tr. at 531:20-532:2. Therefore, it was reasonable for Mr. Hedrick to conclude that W.A.N. would not have moved beyond unskilled or semiskilled jobs into supervisory positions or occupations requiring technical training. Tr. at 523:11-23, 530:4-532:16.

Mr. Stipe testified that in evaluating a child's likely future employment, "the apple doesn't fall too far from the tree" because the child more likely than not "will follow in the footsteps of parents and sometimes other family members." Tr. at 300:12-22. W.A.N.'s parents have been employed in unskilled or semiskilled jobs. W.A.N's father, Mr. Neria, is employed as a pipelayer, which is one of the jobs Mr. Stipe identified in the "unskilled and semiskilled" category of his Pre-Injury Model A. Tr. at 304:20-305:1, 416:7-9. Ms. Cudney, W.A.N.'s mother, is currently employed building winches, and previously worked in retail, the food industry, banking, and parts delivery. Tr. at 160:5-13. There is no evidence that either Mr. Neria or Ms. Cudney has ever worked in an occupation that required specialized technical training, or that involved supervisory responsibilities. Therefore, it was not reasonable for Mr. Stipe to conclude that W.A.N. would have obtained employment in skilled or supervisory positions.

The range of income that Mr. Stipe included in his Pre-Injury Model A for unskilled or semiskilled occupations is very close to the range of income Mr. Hedrick included in his No-

11

Injury Model A. Tr. at 528:23-529:21, Ex. 22.0010-11, Ex. 24.0009. The court finds this further supports the reliability of Mr. Hedrick's opinion regarding the likely range of income W.A.N. would have earned if he had not been injured.

The reliability of Mr. Stipe's opinion is further undermined by the fact that the average annual income for high school graduates in the state of Oregon is $37,024, according to the State of Oregon Employment Department. Tr. at 526:3-527:21, Ex. 24.0010. This is inconsistent with Mr. Stipe's opinion that a high school graduate such as W.A.N., would likely have achieved an income of $85,010 within 10 years after high school (Pre-Injury Model B) or $126,131 within 15-17 years after high school (Pre-Injury Model C). Mr. Stipe testified that the average income figure is a "junk statistic," but Mr. Stipe relies on data published by the State of Oregon Employment Department. Tr. at 308:11-22, 328:9-16.

Mr. Hedrick testified that he has successfully assisted persons with limited or no use of one arm to find employment in sedentary occupations, and that they have been able to perform their job duties. Tr. at 533:8-536:25. Mr. Hedrick has also studied the activities of persons in the sedentary jobs he recommends and concluded that there is no risk of overuse injury because typing and data entry occupy only a minimal amount of their work time. Tr. at 533:21-534:24. The court finds this testimony persuasive.

Mr. Stipe opined that W.A.N. will need extensive vocational rehabilitation if he is able to find employment. Mr. Hedrick testified that the sedentary jobs he identified require only on-the-job training, and that if any additional training is required, it can be obtained through Oregon's vocational-rehabilitation services. Tr. at 314:21-315:16, 536:13- 537:10, Ex. 22.0014.

Based upon the foregoing, the court finds that W.A.N.'s loss of income-earning capacity is better represented by the difference between the potential income set forth in Mr. Hedrick's

No-Injury Model A and his Injury Model D. With these findings in mind, the court turns to a determination of the present value of this loss and the cost of replacing household services.

## II.    Loss of Household Services

### A.    Plaintiffs' Position Concerning Household Services

Plaintiffs relied on Mr. Stipe's testimony in support of their claim for the cost of replacing household services that W.A.N. will be unable to perform because of his right arm disability. Mr. Stipe testified that W.A.N. will only be able to perform 25% of household services and thus will have to hire persons to perform the remaining 75%. Tr. at 316:7- 317:18. Mr. Stipe cited no source of information for that opinion other than "my knowledge of working with people over the years, interviewing people, interviewing particularly blue collar males about the level and extent of household activities that they pursue." Tr. at 340:1-341:4, 342:17-343:12, Ex. 22.0015.

Mr. Stipe opined that the household services W.A.N. will need to replace will cost an average of $35.00 per hour. Tr. at 318:2-319:3. Mr. Stipe cited no source for that opinion other than a review of the costs of services on Craigslist. Tr. at 318:18-319:3, 341:10-342:14, Ex. 22.0016. Mr. Stipe opined that W.A.N. will require replacement of these household services beginning at age 18 and continuing for 57.4 years thereafter. Tr. at 317:16-318:1.

### B.    Defendant's Position Concerning Household Services

The United States' vocational-rehabilitation expert, Mr. Hedrick, did not render an opinion about household services because "[t]hat's not part of a job as a vocation expert witness." Tr. at 546:8-11. The United States' economics expert, John Curtis, CPA, provided information regarding household services from data produced by the U.S. Department of Labor's Bureau of Labor Statistics (BLS). Tr. at 654:2-23. This information is collected in The Dollar

Value of a Day: 2014 Dollar Valuation (Expectancy Data, 2015), which collects and organizes BLS data showing "the value created in a day as measured by the price of hiring persons whose marketplace work relates to the time use of people during the course of a day." Ex. 30.0009.

The Dollar Value of a Day lists seven types of housework in the category "Household Production" and five types of housework in the category "Caring and Helping." Ex. 30.0024. The average number of hours per week that men ages 18 and over spend performing those services is listed, along with the hourly value of each type of service. *Id*. The hourly values plus the cost of legally required benefits are derived from the BLS's Occupational Employment Statistics survey. Ex. 30.0020.

The Dollar Value of a Day provides a comprehensive list of the specific household activities and services included in each type of housework. Ex. 30.0025-35. Based on the hourly values for household services shown in The Dollar Value of a Day, Mr. Curtis concluded that a reasonable average value for the cost of replacing household services is $13.50 per hour. Tr. at 655:6-656:5.

### C.      The court is not entirely persuaded by the testimony of Mr. Stipe

Mr. Stipe presented no data or information supporting his opinions regarding the percentage of household services that will need to be replaced or the cost of those services. Although Mr. Stipe testified that he had checked the costs of services on Craigslist, he produced no specific information reflecting his findings. In contrast, Mr. Curtis provided data that the court finds more credible and reliable than Mr. Stipe's opinions. The data Mr. Curtis provided from The Dollar Value of a Day is based on information produced by the BLS, which Mr. Stipe recognizes as a reliable source of information regarding household services. Tr. at 340:1-11. This

14

data provides a reliable basis for estimating the percentage of services W.A.N. will be required to replace, as well as the cost of those services.

The category of household services that involves the most physically demanding activities is "Pets, Home & Vehicles." Ex. 30.0026-27, Table 203. It is readily apparent that many of the activities listed in Table 203 would be very difficult or impossible for someone with a significant disability in one arm to perform. The average time spent performing the services listed in the "Pets, Home & Vehicles" category is 4.75 hours per week. Ex. 30.0024. The total number of weekly hours spent performing household services in the "Household Production" and "Caring and Helping" categories is 17.92 hours. *Id*.

Based upon the evidence at trial, adult men in the United States spend an average of 2.37 hours per day, or 865 hours per year, rendering household services. Taking the categories into account, and the condition of W.A.N. as set forth at trial, the court finds that W.A.N. will be required to replace 35% of household services, representing 302.75 hours per year. Mr. Stipe opined that W.A.N. will require replacement of these household services beginning at age 18 and continuing for 57.4 years thereafter. The court accepts Mr. Stipe's determination of the number of years necessary to replace household services. In considering the testimony of the parties' experts, the court further finds that the hourly rate of $13.50 is a reliable estimate of the average cost to replace household services.[4] The court now turns to a determination of the Present Value of Economic Damages.

---

[4] The loss of household services would therefore equal (302.75 x 13.50) x 57.4 years or $234,601.

## III.    Present Value of Economic Damages

### A.    Plaintiffs' Position Regarding Present Value of Economic Damages

Plaintiffs presented the testimony of Ronald Missun, PhD, an economist, regarding the present value of W.A.N.'s future economic damages. Tr. at 420:6-421:1. Dr. Missun relied on Mr. Stipe's opinions regarding W.A.N.'s loss of income earning capacity and the cost of replacing household services. Tr. at 429:2-13, 434:7-10. Dr. Missun employed the "total offset" method of calculating present value, under which the rate of increase in future damages equals the discount rate used to reduce the future damages to present value. Tr. at 431:24-432:6. Dr. Missun relied on the average rate of increase in wages and benefits as the inflation factor, and he relied on the average rate of return on 91-day United States Treasury instruments as the discount factor. Tr. at 427:1-22.

Based on Mr. Stipe's data and the total offset method, Dr. Missun calculated that the present value of W.A.N.'s lost income if he is never gainfully employed (Post-Injury Model A) would be $5,071,606 under the assumptions in Mr. Stipe's Pre-Injury Model B, and $3,465,327 under Mr. Stipe's Pre-Injury Model C. Tr. at 429:5-431:16. Dr. Missun calculated that if W.A.N. is able to obtain employment in jobs described in Mr. Stipe's Post-Injury Model B, the present value of his lost income would be $3,801,462 under the assumptions in Mr. Stipe's Pre-Injury Model B, and $2,195,183 under Mr. Stipe's Pre-Injury Model C. Tr. at 430:5-24. Dr. Missun did not calculate a present value based on Mr. Stipe's Pre-Injury Model A, which assumes W.A.N. would have been employed in unskilled or semiskilled occupations. Tr. at 429:5-18.

In regard to household services, Dr. Missun relied on the assumptions provided by Mr. Stipe and calculated that the present value of replacing 75% of household services at the rate of $35.00 per hour is $1,303,419. Tr. at 434:11-435:5.

16

**B.     Defendant's Position Regarding Present Value of Economic Damages**

The United States presented the testimony of John Curtis, CPA, regarding the calculation of the present value of W.A.N.'s economic damages. Tr. at 636:3-637:10. Mr. Curtis relied on the average Consumer Price Index inflation rate over the past 20 years to calculate the future increases in W.A.N.'s economic damages. Tr. at 640:23-642:17. Mr. Curtis relied on the average return on 10-year United States Treasury instruments as the discount factor. *Id*. Based on these values, Mr. Curtis determined that an appropriate net discount rate was 1.38%. Tr. at 644:19-645:14. Mr. Curtis calculated that the present value of W.A.N.'s loss of income-earning capacity is $2,028.00 based on Mr. Hedrick's opinion that, W.A.N. likely would have been employed in unskilled or semiskilled jobs in the absence of his injury (No-Injury Model A), and likely will be able to obtain employment in sedentary occupations with his injury (With-Injury Model D). Tr. at 647:22-648:23, Ex. 25.0004, 25.0010-11.

Mr. Curtis calculated that the present value of W.A.N.'s loss of income-earning capacity is $181,124.00 if W.A.N. obtains employment in light-duty jobs with his injury. Tr. at 648:24-649:16, Ex. 25.0004, 25.0012-13. Mr. Curtis also calculated that the present value of income loss based on Mr. Stipe's Pre-Injury Model A (employment in unskilled or semiskilled jobs) and Mr. Stipe's Post- Injury Model B (employment in sedentary jobs) would be $18,376.00. Ex. 27.0001-4.

Mr. Curtis calculated the present value of the cost of replacing household services at the rate of $13.50 per hour. Ex. 28.0001. Mr. Curtis included calculations based on various assumptions as to the percentage of household services that will need to be replaced. Id.

17

### C.      The court is persuaded by the conclusions of Mr. Curtis

The Court finds the conclusions of Mr. Curtis more reliable than those of Dr. Missun. Mr. Curtis reasonably relied on the average rate of return of 10-year U.S. Treasury investments, given the fact that the funds will not begin to be paid out for almost 14 years, when W.A.N. reaches 18 years of age, and will then continue to be paid out for an additional 38 years (income replacement) and 57 years (household services). The average return on 10-year Treasury investments substantially exceeds the return on 91-day Treasury investments that Dr. Missun relies on for his discount factor. Dr. Missun's report shows that the average return on 10-year investments exceeds that of 91-day investments by between 1.5% and 2.2%, depending on the period chosen for comparison. See Ex. 23.0035, Fig. 4.

Dr. Missun argued against relying on 10-year investments because of the risk that rising interest rates during the 10-year term could diminish their value. However, Mr. Curtis explained that the risk of rising rates can be minimized through a tiered approach to purchasing Treasury instruments or through purchases and sales of the instruments on the secondary market. Tr. at 427:21-429:1, 645:15-646:9. The court is persuaded that a tiered approach appropriately reduces the risk of rising interest rates.

In addition, Dr. Missun argued that Mr. Curtis's net discount rate of 1.38% was high because it is based on average price inflation rather than average compensation inflation. Tr. at 432:7-433:3. However, that difference is more than offset by the difference between the returns on the 10-year and 91-day Treasury investments. The 10-year instrument's average return exceeds average compensation inflation by 1.4% over 50 years, by 2.0% over 40 years, and by 1.6% over 30 years. Ex. 23.0035, Fig. 4.  The Court finds the 1.38% net discount rate employed

by Mr. Curtis to calculate the present value of future damages to be reasonable, and the court will rely on Mr. Curtis's present-value calculations.

The court finds Mr. Curtis' calculation that the present value of W.A.N's loss of income-earning capacity of $181,124.00 is persuasive. Based on the evidence in the record, the court believes it is more likely that W.A.N. will obtain employment in light-duty jobs with his injury. Tr. at 648:24-649:16. As set forth above, the PEEDS-RAPEL method, in the court's view, supports this finding. Further it is more likely than not that W.A.N would have been employed in unskilled or semiskilled jobs if he had not suffered an injury.

Finally, based upon the evidence before the court, the court finds that the present value of the cost of replacing household services that W.A.N. will be unable to perform is $234,061.00 representing the present value of the cost of replacing 35% of household services at the rate of $13.50 per hour.

## VOCATIONAL TRAINING

It is clear from the evidence before the court, that W.A.N. will need vocational training to aide him in having a meaningful and productive life. The Tenth Circuit has held that "district courts have inherent authority to impose a trust as part of a judgment in FTCA cases." *Duplan v. Harper*, 188 F.3d 1195, 1202, 1999 WL 603745 (10th Cir. 1999). *See Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir.1992) ("We agree that courts cannot subject the government to ongoing obligations like the continuing payments proposed in *Frankel*. However, provided that the government satisfies its obligation up front in one lump sum, nothing in the FTCA prohibits courts from exercising their inherent authority to structure awards or to impose trusts or reverter conditions to ensure that the damage recovery is in the best interest of the victim."). The reasoning behind such a trust is to "(1) to ensure that the recovery benefits the victim, and (2) to

19

exercise strict supervision over investment and use of the funds if the victim is a legal

incompetent or otherwise in need of protection." *Hull*, 971 F.2d at 1505.

The court finds that it is in the best interest of W.A.N. to have part of the damages paid in

the form of a fully reversionary trust. *See id.* These funds should be used to help in vocational

training, and as set forth in *Hull*, the government's obligation to W.A.N. ceases when it pays a

fixed lump sum to fund that trust. *Id.* The court finds the damages for Loss of Income,

$181,124.00, are to be placed into a reversionary trust to aide W.A.N. in vocational training.

## CONCLUSIONS OF LAW

The Court has subject-matter jurisdiction of this case under the Federal Tort

Claims Act. 28 U.S.C. §§ 1346(b)(1), 2671-2680.

Venue is proper in the United States District Court for the District of Utah

because the acts or omissions on which Plaintiffs base their claim occurred in this

district. 28 U.S.C. § 1402(b).

The law of Utah, where the relevant events occurred, governs the substantive

issues in this case. 28 U.S.C. § 1346(b)(1).

Under Utah law, a plaintiff alleging medical negligence bears the burden of proving

damages proximately caused by the negligence of the health-care providers. *Jensen v. IHC

Hospitals, Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076.

The Court previously concluded that Plaintiffs proved by a preponderance of evidence

that Midtown physicians failed to meet the applicable standard of care in rendering care on

behalf of Ms. Cudney, proximately causing W.A.N.'s injury and damages. (ECF 54 at 22.)

Having concluded that Plaintiffs proved by a preponderance of evidence that Midtown

physicians failed to meet the applicable standard of care, the court enters the following damages

based upon the reasoning set forth above:

| Past Medical Expenses | $191.318.50 |
|---|---|
| Non-economic damages | $350,000.00 |
| Loss of income | $181,124.00 |
| Loss of household services | $234,061.00 |
| Total | $956,503.50 |

**ORDER**

As previously found, the United States violated the standard of care under the FTCA. The court concludes W.A.N. is entitled to damages in the amount set forth above.

IT IS SO ORDERED.

DATED this 8 December 2020.

_____
Dustin B. Pead
United States Magistrate Judge

21